[Cite as *In re N.A.*, 2025-Ohio-1373.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE N.A.

A Minor Child

[Appeal by A.A., Mother]

:
:
:
:
:
:

No. 114472

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 17, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-22902529

---

### *Appearances:*

Judith M. Kowalski, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Appellant-Mother, A.A. ("Mother") appeals from the juvenile court's decision awarding permanent custody of her minor child, N.A.[1] ("the child"), who

---

[1] The father's parental rights were also terminated following this trial. This appeal pertains only to Mother, and as such we do not discuss facts relating to Father in the instant appeal.

was three years old at the time of trial, to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). For the reasons that follow, we find no merit to the appeal and affirm.

## I. Procedural History

{¶ 2} In March 2022, CCDCFS filed a complaint for neglect and dependency and requested predispositional temporary custody of the child. The complaint indicated that this was a refiled matter and that the child had been in CCDCFS custody since December 13, 2021. The complaint alleged that the child was born premature and had resulting medical issues that Mother failed to address, including her failure to take the child to a scheduled surgery in December 2021. The complaint further alleged that Mother (1) had untreated mental-health conditions, (2) lacked independent housing, (3) had three older children removed from her care by the agency, and (4) had convictions for attempted aggravated robbery, attempted felonious assault, and child endangering, the victim of which was a sibling of the child.

{¶ 3} In June 2022, the court adjudicated the child neglected and dependent, terminated predispositional temporary custody, and placed the child in CCDCFS's temporary custody. The agency developed a case plan for Mother, who was incarcerated at the time. In December 2022, the court extended temporary custody, finding that Mother had made progress on her case plan. In May 2023, the court extended temporary custody for a second time, again finding that Mother had made progress with her case plan.

{¶ 4} In November 2023, CCDCFS filed a motion to modify temporary custody to permanent custody, alleging that Mother failed to consistently engage in her case-plan services. Trial commenced on September 26, 2024, and on September 27, 2024, the court granted the motion, terminating Mother's parental rights to the child.

## II. Factual History

{¶ 5} CCDCFS's sole trial witness was Valerie Goodrum ("Goodrum"), a CCDCFS employee who, at the time of trial, was the child's assigned extended protection specialist. She became involved with the child around May 2023, and received and reviewed the child's case file and testified as to its contents.

{¶ 6} Mother had been involved with CCDCFS since 2017, when three of the child's siblings were permanently removed from Mother's care. The child has cerebral palsy, and the instant matter materialized in 2021 when it appeared that Mother was missing some of the child's medical appointments.

{¶ 7} Mother's case plan, which stated a goal of reunification, included services for mental health, substance abuse, housing, basic needs, and anger management. Mother was also required to attend the child's medical and physical therapy appointments.

{¶ 8} Goodrum testified that Mother threatened her twice during the pendency of this matter. The first time, Mother sent her a text message mentioning a family member with Goodrum's last name and asked how this person was doing. Goodrum felt that this was a threatening text message because "[M]other ha[s] a

prior history of felonious assault . . . behavior management . . . . And plus, I had never disclosed any of my family information[.]" (Tr. 25.) The second time was during a visitation when Mother allegedly "brushed against [her]" and told Goodrum that she was "going to beat [her] a\*\*." (Tr. 29.) Goodrum filed police reports after both incidents. She also testified that Mother was no longer allowed to speak to the child's foster mother because Mother had threatened the foster parents and accused them of sexual abuse.

{¶ 9} In the prior filing, Mother had already completed services for parenting and domestic violence. When asked if the services for domestic violence and anger management had benefitted Mother, Goodrum stated that "[Mother] has not made herself present for us to really demonstrate if she has or has not benefitted from the provider's tools and information given to her during these classes." (Tr. 33.) Goodrum also felt that domestic violence was still an issue and cited to an incident in January 2024 where Mother "had to flee from her home" because somebody, who Goodrum believed was a Father to one of the child's siblings, had threatened to kill Mother. (Tr. 34.) Following this incident, Mother lived in a homeless shelter. Goodrum did not know where Mother was living at the time of trial, but stated that she went to the homeless shelter and was informed that Mother had left.

{¶ 10} Despite completing parenting services in the prior filing of this matter, Goodrum remained concerned about Mother's parenting skills, citing unstable housing, "the unhealthy relationships with the domestic violence still going

on," her mental health, and substance abuse. (Tr. 63.) Goodrum did not feel that Mother had demonstrated appropriate judgment or appropriate protective capacities during visits with the child. While she stated that most of the experiences during visitations were positive, Goodrum noted that sometimes Mother did not interact with the child and again noted some incidents that had occurred at the visitations. She acknowledged that Mother had been consistent in appearing for the child's physical therapy appointments but noted that the providers advised CCDCFS that Mother had been using inappropriate language, bringing her other children to the appointments, and interfering with the child's treatment. Goodrum could not verify whether Mother was employed or had any means of financially supporting herself or the child.

{¶ 11} Regarding Mother's mental-health issues, Goodrum testified that mental health remained a concern because Mother did not allow the agency access to records, allowing it to discern whether she had received a benefit from mental-health services. During the pendency of this matter, Mother was referred to and reported that she attended numerous mental health treatment facilities, but Mother was not forthcoming about the nature of the treatment, and she refused to sign forms allowing her medical information to be released to CCDCFS.

{¶ 12} Mother testified on her own behalf, stating that she believed she had made progress on the case plan and felt that Goodrum was unnecessarily harsh and unfair towards her. Much of her testimony centered around her distrust of Goodrum, and Mother offered explanations for the tense relationship between

them.  She stated, "Once I realized Ms. Goodrum did not want to talk to me anymore, I stop talking to her, and just talked to the supervisor, or I'll go into Jane Edna and talk to customer relations on my own." (Tr. 106-107.)  She further testified that the agency did not respond to her texts, calls, or emails.

{¶ 13} Regarding her parenting and anger-management courses, Mother believed that she had benefitted from those programs and noted that one of the providers gave her a job as a security guard that is part time and paid under the table.  She stated that she is a cook and home health aide and that her goal was to start a business.  When discussing visitation, she noted that "[e]very visit was good. The only time it went bad is when someone wanted it to go bad.  Just like when Ms. Goodrum mentioned she called the police . . . ." (Tr. 94.)  She defended her behavior, noting, "I don't know how other mothers portray themselves around environments like that or when it comes to the care or safety of their child . . . but I'm going to behave like that.  I'm emotionally distressed.  I experienced post-partum . . . So it had me, you know, crying." (Tr. 96.)  She also testified that she had transportation issues, which is why some of the visits were cancelled.

{¶ 14} When questioned about her mental health and substance abuse, Mother testified that she "overcame those obstacles." (Tr. 87.)  She explained that she quit going to Murtis Tayor because "they were no help." (Tr. 87.)  She explained that in either June or July 2024, she began treating with two providers at MetroHealth, which included therapy and an intensive outpatient program ("IOP").

{¶ 15} Regarding housing, Mother testified that she is currently "working on" securing housing, "searching for houses in and out of Ohio," and that the process had to be restarted because of misinformation about her IOP treatment. (Tr. 90-91.)

{¶ 16} The child's guardian ad litem did not testify, instead maintaining the recommendation in her report that the child's best interests would be served if the agency had permanent custody.

{¶ 17} Following trial, the juvenile court granted permanent custody of the child to the agency, and Mother appeals, assigning three errors for our review.

> I. The decision of the Cuyahoga County Juvenile Court granting permanent custody of the child to the Cuyahoga County Division of Children and Family Services was against the manifest weight of the evidence.

> II. The evidence was insufficient to support permanent custody of the child to the Cuyahoga County Division of Children and Family Services.

> III. The Cuyahoga County Juvenile Court erred to the prejudice of the appellant by permitting hearsay testimony by the caseworker.

### III. Law and Analysis

{¶ 18} In her first assignment of error, Mother contends that the juvenile court's judgment granting permanent custody to CCDCFS was against the manifest weight of the evidence. Her second assignment of error contends that the juvenile court's judgment was based on insufficient evidence.

{¶ 19} The proper standard of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to

terminate parental rights are the sufficiency-of-the-evidence and manifest-weight-of-the-evidence standards, depending on the nature of the arguments raised by the parties. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. Sufficiency of the evidence is a test of adequacy, while weight of the evidence depends on its effect in inducing belief. *Id.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When reviewing for manifest weight, "the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a miscarriage of justice that the judgment must be reversed, and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When applying a sufficiency-of-the-evidence standard, a reviewing court should affirm a trial court when the evidence is legally sufficient to support the trial court's judgment as a matter of law. *Id.* at ¶ 13.

{¶ 20} Pursuant to R.C. 2151.414, a juvenile court may grant permanent custody of a child to an agency if, after a hearing, the court determines by clear and convincing evidence that one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies, and that an award of permanent custody is in the child's best interest. Clear and convincing evidence is evidence that produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re T.B.*, 2014-Ohio-2051, ¶ 28 (8th Dist.).

{¶ 21} Here, Mother does not contest the juvenile court's finding pursuant to R.C. 2151.414(B)(1)(d), that the child had been in agency custody for "twelve or

more months of a consecutive twenty-two-month period." We nevertheless find that the record supports this finding based on the child's uninterrupted placement with the agency since December 11, 2021.

{¶ 22} Although one factor under R.C. 2151.414(B)(1) is sufficient, the juvenile court also found that the child cannot be placed with Mother within a reasonable time or should not be placed with Mother within a reasonable time pursuant to R.C. 2151.414(B)(1)(a). The juvenile court found that R.C. 2151.414(E)(1), (4), (7), (10), and (16) supported this finding. Pursuant to (E)(1), the juvenile court found that Mother failed to remedy the problems that initially caused the child's removal despite reasonable case planning and diligent efforts by CCDCFS. Pursuant to (E)(4), the juvenile court found that Mother demonstrated a lack of commitment towards the child by failing to regularly support, visit, or communicate with the child when able to do so. Pursuant to (E)(7), the juvenile court found that Mother had been convicted of endangering children related to a sibling of the child. Pursuant to (E)(10), the juvenile court found that "[t]he parent has abandoned the child."[2] And, pursuant to (E)(16), the court found it relevant that "[t]he child has been in the agency's custody for almost three years."

{¶ 23} Turning to the best-interest determination, R.C. 2151.414(D)(1) requires that in determining the best interest of the child, the court must consider all relevant factors, including but not limited to those listed in R.C. 2151.414(D)(1).

---

[2] The journal entry does not specify whether this factor refers to Mother or Father. The agency's brief indicated that it could be relevant to either parent, based on Mother's extended lack of visitation with the child.

Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent custody determination, "there is not one element that is given greater weight than the others." *In re Schaefer*, 2006-Ohio-5513, ¶ 56.

{¶ 24} Mother appears to direct her manifest-weight challenge to both the R.C. 2151.414(B)(1)(a) findings as well as the best interest findings that the juvenile court made pursuant to R.C. 2151.414(D)(1) and (2). She points to numerous portions of the record where the evidence weighed in favor of the juvenile court denying the agency's motion for permanent custody of the child. Mother notes that she completed her case-plan objectives for parenting, anger management, and domestic violence. Mother testified that she was in the care of a doctor and therapist at MetroHealth and that she was in the process of completing an IOP. Mother also notes that the record supported that most of the visits between Mother and child were positive and without incident. Mother also urges this court to consider her tenuous and untrusting relationship with Goodrum and consider Goodrum's accusations against her in weighing the evidence.

{¶ 25} Upon review of the record, we agree that several portions of the record support Mother's contentions and demonstrate that she made progress on her case plan. We also find, however, that clear and convincing evidence in the record supports the juvenile court's conclusions concerning both the R.C. 2151.414(B)(1)(a) determination as well as the court's best-interest-of-the-child determination.

{¶ 26} The record demonstrates that this matter had been pending since 2021, and that during this time, Mother had made some progress on her case plan, but did not fully address the issues and concerns that the agency had that led to the child's initial removal. Goodrum's testimony acknowledged that Mother had completed several of the services, including parenting, anger management, and domestic violence. However, Goodrum did not believe that Mother demonstrated a benefit from the services based on her personal observations of Mother and her lack of communication with the agency. She noted that Mother had only attended one visit with the child from April 2024 through September 2024. Though Goodrum's testimony confirmed that most of the visits between Mother and the child were positive and that they have a loving bond, she stated that sometimes, Mother did not engage with the child. Goodrum's testimony also indicated that Mother was inconsistent with appearing for the child's medical appointments and often interrupted the provider while treating the child.

{¶ 27} Mother admitted that she had only recently engaged in mental-health treatment and had not completed the services at the time of trial. Additionally, Mother was not forthcoming and refused to sign release-of-information forms to allow the agency access to her medical records and did not consistently maintain contact with the agency. While Mother testified regarding her mental-health treatment, Mother did not allow the agency to access any of this information so that it could verify that Mother complied with these areas of the case plan. Mother also

lacked stable housing during the pendency of the proceedings, and CCDCFS was unable to verify whether Mother had adequate housing at the time of trial.

{¶ 28} The testimony received also indicates that the child was thriving in his foster placement and that his needs were being met by his foster caregivers. And, the child's guardian ad litem recommended that CCDCFS custody was in the child's best interest.

{¶ 29} On this record, we find that the juvenile court's determination that permanent custody is in the child's best interest is not against the manifest weight of the evidence or that the judgment created a manifest miscarriage of justice. The record reflects that Mother was inconsistent in completing her case-plan objectives and that Mother did not remedy the conditions leading to the child's removal after nearly three years of agency intervention. We therefore overrule Mother's first assignment of error.

{¶ 30} Mother's second assignment of error contends that the juvenile court's decision to terminate her parental rights was based on insufficient evidence. Mother argues that Goodrum "did not testify regarding the mother's substance use at all," but Mother testified that she was attending an IOP and that she had not used marijuana since June 2024. Mother also contests Goodrum's testimony that she was inconsistent with attending the child's medical appointments and points out that on cross-examination, it was revealed that the appointments were in Akron, although Mother lived in Cleveland and did not own a vehicle. Mother also relies on the two motions for extension of temporary custody that CCDCFS filed during the

pendency of this matter, both of which cited Mother's progress in completing the case plan.

{¶ 31} As already discussed, we acknowledge Mother's progress on the case plan, but Mother had not made substantial progress at the time of trial even though this matter had been pending since late 2021. Mother's testimony was that she was still working through many of her case-plan objectives and had only recently started some of them in 2024. We find that the record before us contains sufficient evidence to support the juvenile court's determination that custody to CCDCFS is in the child's best interest. Accordingly, we also overrule Mother's second assignment of error.

{¶ 32} In her final assignment of error, Mother argues that the juvenile court erred in permitting the caseworker to testify regarding her mental-health treatment when no certified records were admitted into evidence and none of her providers testified. Mother argues that this was inadmissible hearsay and that the court's reliance on it was in error.

{¶ 33} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Unless hearsay statements fall under a recognized exception, they are inadmissible. Evid.R. 802. Juvenile court judges are presumed to be able to disregard improper testimony. *In re J.T.*, 2009-Ohio-6224, ¶ 70 (8th Dist.). Therefore, the admission of hearsay evidence in parental rights cases, even if error, is not considered prejudicial unless it is shown that the court relied on

improper evidence in making its decision. *Id.*, citing *In re Lucas*, 29 Ohio App.3d 165, 172 (3d Dist. 1985).

{¶ 34} This court has previously held that it is not error for a caseworker to testify regarding reports that predate her assignment to the case. *In re Z.T.*, 2007-Ohio-827, ¶ 20 (8th Dist.). Moreover, the caseworker may competently testify to the contents of the agency's case file under Evid.R. 803(6), a hearsay exception for records kept in the ordinary course of business, and Evid.R. 803(8), a hearsay exception for public records and reports that set forth the activities of an agency and contain matters observed pursuant to a duty of law that the agency has a duty to report. *Id.* at ¶ 21, citing *In re* McCullough, 2001 Ohio App. LEXIS 5392 (8th Dist. Dec. 6, 2001); *In re Brown*, 2006-Ohio-2863, ¶ 32, fn.1 (4th Dist.); *In re Garvin*, 2000 Ohio App. LEXIS 2625 (8th Dist. June 15, 2000).

{¶ 35} At trial, Goodrum stated that the case file that she received from the prior caseworker contained records regarding Mother's mental-health treatment history. She testified that Mother's case file indicated that she had been "diagnosed with mental health concerns from a slew of providers that she has went to, and she has been diagnosed with Borderline Personality Disorder." (Tr. 38.) After Mother's counsel objected, the court stated that the objection was noted and that "the Court will only consider this [testimony] based on the previous documentation that was already certified with the Court on previous case number — or previous cases regarding the assertion of mental health services." (Tr. 39.) Goodrum then testified that Mother's casefile indicated that Mother (1) had two prior psychiatric

hospitalizations, (2) was referred for a mental-health assessment at the juvenile diagnostic clinic in February 2024, and (3) had previously engaged in mental health services with numerous providers since this case and the prior case were pending. She testified that Mother was attending Murtis Taylor but that, to her knowledge, Mother was inconsistent in attending these services because Mother "was looking for a new provider." (Tr. 41.)

{¶ 36} Goodrum testified that even though Mother communicated to the agency that she was participating in services at MetroHealth, the agency referred her elsewhere because it "could not successfully get the information from MetroHealth, the records to review." (Tr. 42.) She also testified that when contacted by MetroHealth to provide information for the assessment, the agency was unable to provide any information to them, thus making Mother the primary source of information for that assessment. This concerned Goodrum because the agency did not know "if [Mother] was forthcoming with the information explaining why her child was brought into Agency custody and her history of concerns of the Agency." (Tr. 43.) Goodrum also testified that she did not believe that Mother had adequately addressed the mental-health concerns and cited an incident during a visitation.

{¶ 37} Based on the totality of the record before us, including a full analysis of Goodrum's testimony and the juvenile court's statements on the record, we find that Goodrum's testimony was properly admitted and considered to the extent that it was based on her personal observations and the information kept within the case file by the prior caseworker and herself. Moreover, the juvenile court made it

abundantly clear that it was not going to consider any improper testimony received. Mother summarily directs us to the juvenile court's reliance on her lack of mental-health treatment to support her argument that it considered improper hearsay evidence. Our review, however, reveals that all of Goodrum's testimony surrounding Mother's mental-health treatment, especially her lack of knowledge of Mother's mental-health treatment, was admissible because it was based on her personal observation or the records kept by the agency.

{¶ 38} Mother's third assignment of error is overruled.

## IV. Conclusion

{¶ 39} The juvenile court's determination granting the agency's motion for permanent custody and thus terminating Mother's parental rights was not against the manifest weight of the evidence, nor was it based on insufficient evidence. Moreover, after careful consideration of Mother's arguments and a thorough examination of the transcript, we cannot say that the juvenile court improperly considered any hearsay evidence in making its decision.

{¶ 40} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

MICHAEL JOHN RYAN, P.J., and
SEAN C. GALLAGHER, J., CONCUR